ACCEPTED
01-14-00656-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
2/23/2015 9:57:19 AM
CHRISTOPHER PRINE
CLERK

# No. 1-14-00656-CR

In the
Court of Appeals
For the
First District of Texas
At Houston

───────◆───────

**No. 1036165**
In the 209th District Court
Of Harris County, Texas

───────◆───────

# RONALD ROBINSON,

*Appellant*

V.

# THE STATE OF TEXAS

*Appellee*

───────◆───────

# STATE'S APPELLATE BRIEF

───────◆───────

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

2/23/2015 9:57:19 AM

CHRISTOPHER A. PRINE
Clerk

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**KIMBERLY APERAUCH STELTER**
Assistant District Attorney
Harris County, Texas
TBC No. 19141400
stelter_kimberly@dao.hctx.net

**LANCE LONG**
Assistant District Attorney
Harris County, Texas

1201 Franklin, Suite 600
Houston, Texas 77002
Tel: (713) 755-5826
FAX: (713) 755-5809

*Counsel for Appellee*

ORAL ARGUMENT REQUESTED ONLY IF GRANTED TO APPELLANT

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. P. 39, the State requests oral argument only if oral argument is granted to the appellant.

## IDENTIFICATION OF THE PARTIES

Counsel for the State:

**Devon Anderson** — District Attorney of Harris County

**Kimberly Aperauch Stelter** — Assistant District Attorney on appeal

**Lance Long**— Assistant District Attorney at trial

Appellant or criminal defendant:

**Ronald Robinson**

Counsel for Appellant:

**Ken Goode**— Counsel on appeal

**Charles Medlin**— Counsel at trial

Trial Judge:

**J. Michael Wilkinson**— Presiding Judge

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ................................................i

IDENTIFICATION OF THE PARTIES ........................................................i

INDEX OF AUTHORITIES.................................................................... iii

STATEMENT OF THE CASE.................................................................1

STATEMENT OF FACTS ....................................................................1

SUMMARY OF THE ARGUMENT PRESENTED ..................................7

REPLY TO  APPELLANT'S FIRST POINT OF ERROR....................................7

Trial Counsel did not render ineffective assistance of counsel since introduction of Mason's prior conviction was trial strategy and did not prejudice appellant's case. ...................................................................................................7

REPLY TO  APPELLANT'S SECOND POINT OF ERROR...............................13

The trial court did not err in failing to sua sponte give a jury charge on Fuentes being an accomplice witness when the evidence did not establish that Fuentes was an accomplice either as a matter of law or fact and there was more than sufficient corroboration of Fuentes' testimony. ...................................................13

CONCLUSION .........................................................................18

CERTIFICATE OF SERVICE AND COMPLIANCE ...........................................19

# INDEX OF AUTHORITIES

**CASES**

*Almanza v. State,*
686 S.W.2d 157 (Tex. Crim. App. 1984) (op. on reh'g) .............................. 15, 19

*Blake v. State,*
971 S.W.2d 451 (Tex. Crim. App. 1998) .................................................. 16, 17

*Bone v. State,*
77 S.W.3d 828 (Tex. Crim. App. 2002) ........................................................ 8, 9

*Casanova v. State,*
383 S.W.3d 530 (Tex. Crim. App. 2012) ....................................................... 20

*Druery v. State,*
225 S.W.3d 491 (Tex. Crim. App. 2007) ....................................................... 18

*Ex Parte Hill*,
863 S.W.2d 488 (Tex. Crim. App. 1993) ....................................................... 12

*Ex Parte Imoudu*,
284 S.W.3d 886 (Tex. Crim. App. 2009) ......................................................... 8

*Ex Parte Martinez*,
330 S.W.3d 891 (Tex. Crim. App. 2011) ....................................................... 14

*Heiman v. State,*
923 S.W.2d 622 (Tex. App.—
Houston [1st Dist.] 1995, pet. ref'd) ............................................................. 13

*Herron v. State,*
86 S.W.3d at 621 (Tex. Crim. App. 2002) ..................................................... 19

*Kunkle v. State,*
771 S.W.2d 435 (Tex. Crim. App. 1986) ....................................................... 18

*Lewis v. State*,
448 S.W.3d 138 (Tex. App.—
Houston [14th Dist.] 2014, pet. ref'd) ........................................................... 21

*Mallett v. State*
65 S.W.3d 59 (Tex. Crim. App. 2001) ............................................................. 9

*McCallum v. State,*
   311 S.W.3d 9 (Tex. App.—
   San Antonio 2010, no pet.)..................................................................18

*Neal v. State,*
   256 S.W.3d 264 (Tex. Crim. App. 2008)...............................................19

*Ngo v. State,*
   175 S.W.3d 738 (Tex. Crim. App. 2005)...............................................15

*Paredes v. State,*
   129 S.W.3d 530 (Tex. Crim. App. 2004)...............................................17

*Roys v. State,*
   416 S.W.3d 229, 234 (Tex. App.—
   Amarillo 2013, pet ref'd) .....................................................................18

*Rylander v. State,*
   101 S.W.3d 107 (Tex. Crim. App. 2003).................................................9

*Saunders v. State,*
   817 S.W.2d 688 (Tex.Crim.App.1991).................................................20

*Strickland v. Washington,*
   466 U.S. 668 (1984) ........................................................................8, 13

*Thompson v. State,*
   9 S.W.3d at 808, 813 (Tex. Crim. App. 1999).........................................9

*Thompson v. State,*
   915 S.W.3d 897 (Tex. App.—
   Houston [1st Dist.] 2006, pet. ref'd) .....................................................10

*Williams v. State,*
   301 S.W.3d 675 (Tex. Crim. App. 2009).................................................8

## STATUTES

Tex. Code Crim. Proc. 38.14 ...............................................................14

## RULES

Tex. R. App. P. 39............................................................................... i
Tex. R. App. Proc. 44.2 .......................................................................12

**TO THE HONORABLE COURT OF APPEALS:**

## STATEMENT OF THE CASE

Appellant was charged with capital murder (CR.–203). He pled not guilty to the charge, and the case was tried to a jury (CR. –203). The jury found him guilty and assessed punishment at life in the Institutional Division of the Texas Department of Criminal Justice on July 31, 2014 (CR –203). The appellant filed notice of appeal that same day, and the trial court certified his right to appeal (CR – 206-207).

## STATEMENT OF FACTS

Jimmy Sims worked as a machinist, but his passion and hobby was running a boxing club where he coached young men and boys (RR. II-63). Appellant's son Ronnie was a member of the boxing club (RR. II-65, III-87). Appellant's wife Flor would take Ronnie to the gym for boxing lessons and became friends with Sims (RR. III-88). Their relationship progressed beyond friendship, however, and eventually turned into a long-term affair, lasting several years (RR. III-88).

Sims' wife Jeneanne discovered the affair in 1989 (RR. III-70). She confronted her husband about it, and they agreed to stay together and work on the marriage (RR. III-71). Appellant also found out about the affair in 1989 (RR. III-92). Appellant, who had been physically abusive to Flor in the past, escalated the

violence, beating her on a daily basis (RR. III-102). He also called Sims and his wife several times, and seemed more angry and belligerent as time went on (RR. III-78).

Sims and his wife began to receive letters, purporting to come from Flor, [1] that were very sexually explicit (RR. 87, III-90, State's exhibit No. 42-48). Appellant also sent a letter, which he signed, insulting Sims for not having any "guts" and challenging Sims to meet him "in any ring." (State's Exhibit no. 49). Appellant repeatedly came by the Sims' home and sat outside the house as Sims left to go to work for his night shift at 10:00 p.m. (RR. III-95). There were several other incidents where appellant showed up at the Sims' household threatening retaliation against Sims or exhibiting threatening behavior (RR. III-102, 105, 107). The harassment was such that over the course of two years Sims became convinced that he was going to be killed (RR. III-107).

On the morning of September 5, 1991, Sims' premonition came true. He left for work at the usual time, 10:00 p.m., and Jeneanne saw him off (RR. III-110). Sims had forgotten his pager, so Jeneanne went inside to get it (RR. IIII-111). As she was coming back outside she heard gunshots, so she grabbed a pistol that the family kept on top of the refrigerator (RR. III-111). Once outside she saw her

---

[1] Flor testified that she never sent any letters to Jimmy or Jeneanne (RR. III-105).

2

husband lying in the driveway (RR. III-112). Two men were standing over him firing their guns at him (RR. III-112). They were wearing caps and bandanas, but Jeneanne could tell they were young and looked to be Hispanic (RR. III-114, 134). Jeneanne pointed her pistol at the two and told them to leave (RR. III-113). They pointed their guns at Jeneanne in return, but soon complied and ran off (RR. III-113).

Jeneanne did her best to help her husband, but she could not move him due to his severe injuries (RR. III-115). Help soon arrived and Sims was transported by Life Flight to the hospital (RR. III-116). Sims died the next day from the multiple gunshot wounds he received during the attack (RR. III-121, State's Exhibit No. 61, R. III-133).

Jeneanne suspected from the beginning that appellant was responsible for the shooting, but the investigation seemed to go nowhere (RR. III-116, 123). Appellant was interviewed, and admitted to writing the letters purporting to come from his wife, but denied any involvement in Sims' murder (RR. III-142, 157).

Nothing new transpired in the investigation for many years, until Officer Fikaris, who worked cold cases in the homicide division, reopened the case (RR. III-161, 166). His investigation led to the discovery of several new leads.

Javier Martinez was one such lead. Javier testified that he was involved in a gang and a number of criminal activities when he was a teenager back in 1991, but

had since straightened out his life (RR. VI-10).  Bob Mason, Greg Fuentes and Jonue Saldivar were part of that gang, and together they sold dope, stole cars, and fought a lot (RR. VI-8).  A few days before September 5, 1991, Mason asked Martinez to give him a ride over to a park in Northshore (RR. VI-15).  Once there, Martinez watched as Mason went up to a van and got in (RR.VI-17).  When he returned, Mason was carrying an envelope (RR. VI-18).  Mason told Martinez that he had met with Ronnie's dad, and that Ronnie's dad wanted him to "hurt somebody that was having an affair with his wife." (RR. VI-18).[2]  Later Martinez saw Mason with a .45 caliber gun (RR. VI-19).  Mason said Ronnie's dad had given him the gun as "payment" (RR. VI-20).

On the day of the murder Mason asked Martinez to drive him and another friend, Jonue Saldivar, over to Jimmy Sims' house (RR. VI-21).  Martinez let the two out in an area by Sims' house and waited (RR. VI-26).  He heard gunshots and then saw Mason and Saldivar running back to the car (RR. VI-27).  The two got in the car, and they all quickly left the scene (RR. VI-29-30). Martinez, not wanting to get involved, did not ask any questions about what happened (RR. VI-30).

Greg Fuentes was a friend of Martinez, Mason, and Saldivar and knew them from having grown up together (RR. VI-135).  In late summer or early fall of 1991,

---

[2] Mason was close friends with appellant's son Ronnie and had known him since they went to elementary school together (RR. VI-14).

4

Mason came to Fuentes' house with black ski masks and gloves (RR. VI-143). He also asked for Fuentes' help in getting rid of a gun he had used in a shooting, though he did not describe any of the details of the shooting at the time (RR. VI-146-147). Fuentes put Mason in touch with someone who could help him get rid of the gun (RR. VI-146-147). Fuentes also gave Mason a ride over to appellant's house because Mason did not have a car (RR. VI-148). Once there, Mason got out of the car and walked up to appellant, who was outside his house with his children (RR. VI-149). Mason told appellant, "I took care of your problem. He's dead." (RR. VI-149). Appellant told one of his kids to go inside and bring him his wallet (RR. VI-149). When he got his wallet, appellant gave Mason some money (RR. VI-150). As they drove off, Fuentes tried to question Mason about what was meant by "he's dead," but Mason just shook his head and didn't say much about it (RR. VI-150).

Mason did, however, talk to Kim Conroy,[3] his ex-girlfriend at the time (RR. VI-176). Appellant told Conroy that he and Saldivar had shot a man who had been having an affair with Ronald Robinson's wife and that he had been paid $1,000 and a gun to commit the killing (RR. VI-186 187). Mason described details of the crime, including where it occurred, the man's wife being present, and how he had

---

[3] At the time of the crime Kim Martinez was known by her maiden name, Kim Conroy (RR. III-172). The State will use her maiden name in this statement of facts to avoid any confusion with another witness, Javier Martinez

shot the man at night when the man was coming out of his house (RR. VI-186). Mason told Conroy that appellant's son Ronnie had brokered the deal (RR. VI-188).

A few weeks later Saldivar was killed while attending a party (RR. VI-31). Martinez, Fuentes, Mason and another friend flew down to the valley to attempt a revenge killing (RR. VI-31-32). On their way back, Officer Furstenfeld happened to question the group at the airport because he suspected that they might be drug dealers (RR.III-190). Furstenfeld did not find any drugs on the men, but did recover two .45 caliber guns. He also found an editorial about the drive-by shooting of Jimmy Sims in Mason's pocket (RR. III-196).[4] Furstenfeld was not conducting a murder investigation, but he thought the article was significant, so he copied it and kept it in his files until someone from the district attorney's office called him about the case in 2005 (RR. III-196-197).

Israel Guerra worked with appellant from 1999 to 2004, several years after Sims' murder (RR. VI-66). During the time they worked together, appellant often angrily talked about his ex-wife having an affair with Jimmy Sims (RR. IV-67). Guerra asked if appellant was the one who killed Sims (RR. VI-72). Appellant just smiled and said "no" in a way which led Guerra to believe that appellant had

---

[4] Appellant gave the false name of Robert Garcia to Officer Furstenfeld, but Javier identified a photo of Robert Garcia, taken by Furstenfeld at the time, as being Bob Mason, and the tattoo on "Garcia's" neck matched Mason's tattoo (RR. VI-33-34).

6

something to do with the murder. When Guerra asked him who killed Sims, appellant told him it was one of his son's friends (RR. IV-73).

## SUMMARY OF THE ARGUMENT PRESENTED

Trial counsel did not provide ineffective assistance of counsel when it could have been trial strategy to introduce evidence of Mason's conviction for capital murder and where introduction of such evidence did not prejudice appellant. The trial court did not err in failing to give an accomplice witness instruction on Greg Fuentes since Fuentes was not an accomplice witness as a matter of law or fact. Even if an accomplice witness instruction had been warranted, appellant has shown no harm, since there was ample independent corroboration tying appellant to the commission of the crime.

## REPLY TO APPELLANT'S FIRST POINT OF ERROR

**Trial Counsel did not render ineffective assistance of counsel since introduction of Mason's prior conviction was trial strategy and did not prejudice appellant's case.**

Appellant claims that his counsel was ineffective for allowing and introducing into evidence the fact that Bob Mason was charged and convicted of capital murder in relation to this case.

## Standard of Review on Ineffective Assistance of Counsel

To show ineffective assistance of counsel, a defendant must demonstrate both (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668 (1984); *Ex Parte Imoudu*, 284 S.W.3d 886, 869 (Tex. Crim. App. 2009). Failure to make either one of these required showings defeats an ineffectiveness claim. *See Williams v. State,* 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

Courts indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance; therefore, appellant must overcome the presumption that the challenged action constituted "sound trial strategy." *Williams,* 301 S.W.3d at 687. This review is highly deferential to counsel, and courts do not speculate regarding counsel's trial strategy. *Bone v. State,* 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). To prevail on an ineffective assistance claim, the appellant must provide an appellate record that affirmatively demonstrates that counsel's performance was not based on sound strategy. *Mallett v. State,* 65 S.W.3d 59, 63 (Tex. Crim. App. 2001);*Thompson v. State,* 9 S.W.3d at

8

808, 813 (Tex. Crim. App. 1999) (holding that record must affirmatively demonstrate alleged ineffectiveness). Because the reasonableness of trial counsel's choices often involves facts that do not appear in the appellate record, the Court of Criminal Appeals has stated that trial counsel should ordinarily be given an opportunity to explain his actions before a court reviews that record and concludes that counsel was ineffective. *See Rylander v. State,* 101 S.W.3d 107, 111 (Tex. Crim. App. 2003); *Bone,* 77 S.W.3d at 836; *Mitchell v. State,* 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).

**Appellant has not Rebutted the Presumption of Sound Trial Strategy**

Mason never testified, although he was brought into the courtroom for identification purposes (RR. III-176, VI-188). What Mason said and how he acted after the crime, however, was a major part of the State's case against appellant. For example, the State presented evidence that Mason met with appellant, claimed to have received a gun from him, and told his ex-girlfriend that appellant hired him to commit the murder.

The evidence against Mason was strong, and his comments to others about appellant's involvement were uncontradicted. As a result, defense counsel never tried to establish Mason's innocence or to argue that Mason did not implicate appellant. Rather, counsel's trial strategy was to argue that the evidence tying appellant to the crime came primarily from Mason, that Mason was not credible,

9

and that Mason had some ulterior motive in implicating appellant (RR. V-12, 21-22).

Closing argument is one of the areas where trial strategy is most evident. *Thompson v. State*, 915 S.W.3d 897, 903 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) This case is no exception, as counsel repeatedly stressed Mason's lack of credibility and bias in closing:

> I think we can all agree that [Mason] was a career criminal – is a career criminal, a lifelong gang member. He's out only for only himself. He's a liar and a drug dealer, a thief, and a murderer. You probably can't name a crime that he hasn't done. And now the Government is asking you to make him the keystone on convicting Ronald Robinson based on what he said to other people. And it's up to y'all, up to you. What do you do with the hearsay statements from a liar, killer? Do you use it to convict [appellant] or do you take it as the words of someone that's a liar and a criminal, and that you have to be cautious with how you evaluate it? (RR. V-21).

Counsel then compared the State's case to an inverted pyramid, with Mason and Fuentes being the cube on which the entire State's case was based, and argued again that Mason's statements to others were not credible:

> If you have a reasonable doubt as to the credibility of [Mason] as a source of information, that he could have his own agenda, that he could say, oh, wouldn't it be terrible if he said something bad about someone else and it wasn't true? Is he capable of telling a lie about somebody else? What do you think? Do you think he would hesitate? Do you think that perhaps he was mitigating himself, that he was making himself into some kind of hero? I don't know. He had his own agenda. That's what we all know about him, and if you find him to be credible, then that's a conviction, but if you doubt – if you have doubts about that credibility, those are reasonable doubts and you have to find [appellant] not guilty. (RR. V-23).

That Mason had been convicted of and was serving a life sentence for Sims' murder did not contradict defense counsel's theory that Mason had been lying to everyone about appellant's involvement. It merely showed that this lie, which appellant would have had no reason (or likely opportunity) to contest at Mason's trial, had been Mason's explanation of the crime all along. This fact was already established by Kim Conroy's testimony, and dovetailed nicely with counsel's argument that Mason was a professional hit man who had his own agenda in claiming appellant's involvement.[5]

Appellant cites *Ex Parte Hill*, 863 S.W.2d 488 (Tex. Crim. App. 1993), for the proposition that opening the door to a co-defendant's conviction for the same offense constitutes ineffective assistance of counsel (Appellant's brief, p. 12). *Hill*, however, involved an entirely different scenario, where the co-defendant was being called as an alibi witness, but in fact had entered a plea of guilty to the offense prior to trial. *Ex Parte Hill*, 863 S.W.2d at 489. Furthermore, there was a developed record in that case establishing that defense counsel failed to investigate whether this witness had pled guilty prior to trial. *Id.* ("Trial counsel, while having the affirmative duty to investigate, failed to inquire into the witness's status regarding the offense"). In the instant case, the trial strategy was exactly the

---

[5] "I think he probably is [a professional hit man.] But what you have to decide is, *does that credential make him a believable source of information because that's what this case really comes down to.* (RR. V-12) (emphasis added).

11

opposite. Defense counsel knew of Mason's conviction and used it to fit in with his theory of Mason having his own agenda in claiming appellant's involvement in this case. Introduction of this evidence was clearly a deliberate choice of trial strategy. *Heiman v. State,* 923 S.W.2d 622 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (finding failure to object to extraneous offenses could have been sound trial strategy where there was no record to indicate otherwise and evidence could have arguably supported defense theory of victim being less credible).

**Appellant cannot show he was prejudiced, and thus has not met his burden of showing ineffective assistance of counsel.**

Even if appellant had presented a record establishing that there was no trial strategy for the introduction of Mason's capital murder conviction, he would fail under the second prong of *Strickland*. The *Strickland* prejudice prong presents a more difficult burden than does the harm analysis under TEX. R. APP. PROC. 44.2, requiring that the reviewing court look to the totality of the circumstances and evidence presented to determine if there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Ex Parte Martinez*, 330 S.W.3d 891, 903 (Tex. Crim. App. 2011).

Evidence of appellant's guilt in this case was strong, from his motive to the method. *Ex Parte Martinez*, 330 S.W.3d 904 (finding it unlikely, given ample evidence of the defendant's guilt, that the jury would have reached a different

12

conclusion despite the introduction of inadmissible evidence). Furthermore, the charge instructed the jury that "[A]ny evidence that any witness has been convicted in any case or cases was admitted before you for the purpose of aiding you, if it does aid you, in passing upon the credibility of the witness and the weight to be given his or her testimony, *and you will not consider the same for any other purpose*." (CR. 196)(emphasis added). Defense counsel stressed this page of the charge in his closing argument (RR. V-13). Appellant has not met the second prong of the *Strickland* test.

For all the above reasons, appellant's first point of error is without merit and should be overruled.


## REPLY TO  APPELLANT'S SECOND POINT OF ERROR

**The trial court did not err in failing to sua sponte give a jury charge on Fuentes being an accomplice witness when the evidence did not establish that Fuentes was an accomplice either as a matter of law or fact and there was more than sufficient corroboration of Fuentes' testimony.**


Claims of jury charge error are reviewed under a two-pronged test. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). The first determination is whether error exists. *Ngo v. State,* 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists, the reviewing court should then evaluate the harm caused by that error. *Ngo,* 175 S.W.3d at 743. The degree of harm required

for reversal depends on whether error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only "some harm." *Almanza,* 686 S.W.2d at 171. If error was not objected to, then it must be "fundamental error" and requires reversal only if it was so egregious and created such harm that the defendant has not had a fair and impartial trial. *Id.* In the instant case, counsel did not object, and so the "fundamental error" test applies.

Art. 38.14 of the Texas Code of Criminal Procedure provides that a conviction may not be obtained on the uncorroborated testimony of an accomplice to the crime. TEX. CODE CRIM. PROC. 38.14. A person is considered an accomplice as a matter of law if he could be prosecuted for the same offense as the defendant or for a lesser included offense. *Blake v. State,* 971 S.W.2d 451, 454–55 (Tex. Crim. App. 1998). If the evidence is conflicting, it is proper to leave the question of whether an inculpatory witness is an accomplice witness as a matter of fact to the jury under instructions defining the term accomplice. *Id*

In the case at hand, the jury was instructed on the law of accomplice witness testimony as it applied to Javier Martinez (CR.-192). Specifically, the jury was instructed that Javier Martinez was an accomplice witness as a matter of fact, and that they could not convict appellant unless they found that there was other evidence, outside that of Javier Martinez' testimony, which tended to connect appellant with the offense committed (CR.-192-193). Such an instruction was

14

proper, since Martinez knew that Mason planned to kill or harm Jimmy Sims, drove Mason and Saldivar to the scene of the crime, and quickly drove them away from the scene after the shooting.

Greg Fuentes, by contrast, did not commit any act raising the issue of whether he was an accomplice, and so the trial court did not err in failing to give an accomplice witness charge regarding this witness  The fact that Fuentes was close friends with Mason, that he had committed other crimes with Mason, and that he had been convicted of other non-related crimes was irrelevant, since an accomplice's participation must involve an affirmative act that promotes the commission of the charged offense. *Paredes v. State,* 129 S.W.3d 530, 536 (Tex. Crim. App. 2004).

Nor do any actions taken by Fuentes after the murder serve to establish him as an accomplice witness. Fuentes testified Mason asked for a ride over to appellant's house.  When he arrived, Fuentes heard Mason tell appellant "I took care of your problem.  He's dead" and saw appellant give Mason some money. Fuentes, however, did not know who Mason had shot, or what the meeting was about (RR. 147, 150).  Specifically, Fuentes testified that "[w]henever we left and I turn around and said 'he's dead,' questioning it and he kind of shook his head and like yeah, didn't say much about it." (RR. VI-150). While Fuentes might have known from Mason's comments and actions that a crime was committed, this does

15

not make him an accomplice to the crime. *Blake v. State,* 971 S.W.2d at 454–455 ("[O]ne is not an accomplice for knowing about a crime and failing to disclose it, or even concealing it."); *see generally Kunkle v. State,*771 S.W.2d 435, 439 (Tex. Crim. App. 1986) (discussing what acts do not rise to the level entitling one to an instruction on accomplice witness as a matter of fact). Similarly, while Fuentes later put Mason in touch with someone that could help him get rid of a gun, this did not make him an accomplice to the capital murder of Sims (RR. III-146-147). *Druery v. State,* 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (witnesses who were present at offense and assisted in disposal of murder weapon were not accomplices because they committed no affirmative act promoting commission of the offense); s*ee also McCallum v. State,* 311 S.W.3d 9, 14 (Tex. App.—San Antonio 2010, no pet.) (witness who disposed of evidence after the crime not an accomplice); *Roys v. State,* 416 S.W.3d 229, 234 (Tex. App.—Amarillo 2013, pet ref'd) (same).

Even if the trial court had been required to give an instruction on Fuentes being an accomplice witness, reversal would not be required. Since there was no objection to the charge, appellant must establish "egregious harm" such that appellant was denied a "fair and impartial trial." *Neal v. State,* 256 S.W.3d 264, 278 (Tex. Crim. App. 2008); *Almanza,* 686 S.W.2d at 171. A determination of egregious harm requires an examination of "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the

16

argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* Under this standard, improper omission of an accomplice witness instruction is generally considered harmless unless the corroborating (non-accomplice) evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Herron v. State,* 86 S.W.3d at 621, 632 (Tex. Crim. App. 2002) (quoting *Saunders v. State,* 817 S.W.2d 688, 692 (Tex. Crim. App. 1991).

In the present case, the non-accomplice evidence consisted of: (1) appellant's continued threatening behavior toward Sims over a period of two years (2) evidence that appellant knew Sims' schedule and repeatedly appeared outside his home at the time he left for work, which corresponded to the time of the shooting (3) Kim Conroy's testimony that Mason told her appellant had hired him to commit the murder (4) appellant's statement to his co-worker Israel Guerra that the victim was killed by his son's friend, and (5) Mason's possession of a newspaper clipping regarding the murder, found in Mason's pocket a few weeks after the shooting. These five pieces of evidence are more than sufficient to corroborate the accomplice witness' testimony and connect appellant to the offense. *See Casanova v. State,* 383 S.W.3d 530, 539 (Tex. Crim. App. 2012) (finding no egregious harm from the absence of an accomplice witness instruction); *Lewis v. State*, 448 S.W.3d 138 (Tex. App.—Houston [14th Dist.]

17

2014, pet. ref'd) (same). Appellant's second and final point of error is without merit, and should be overruled.

## CONCLUSION

It is respectfully submitted that all things are regular and the conviction should be affirmed.

DEVON ANDERSON
District Attorney
Harris County, Texas

/s/ *Kimberly Aperauch Stelter*
KIMBERLY APERAUCH STELTER
Assistant District Attorney
Harris County, Texas
TBC No. 19141400
stelter_kimberly@dao.hctx.net

## CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that: (a) the word count function of the computer program used to prepare this document reports that there are 4,320 words in it; and (b) a copy of the foregoing instrument will be served by efile.txcourts.gov to:

Ken Goode
Attorney at Law
P.O. Box 590947
Houston, Texas  77259
Goodedke@msn.com


/s/ *Kimberly Aperauch Stelter*
**KIMBERLY APERAUCH STELTER**
Assistant District Attorney
Harris County, Texas
TBC  No. 19141400
February 11, 2015                          stelter_kimberly@dao.hctx.net

19